The defendant, by his answer, denies all the material allegations of the petition,' and especially denies that said newspaper *102 is of general cirenlation within said Auglaize county, and denies that he ever entered into a contract with plaintiffs for the publication of said proposed amendments.
By an amendment to his answer the defendant says that long prior to the time the relators claim that defendant entered into a contract with them to publish constitutional amendments, he had entered into a written contract with the Minster Post, a German newspaper published in said Auglaize county, whereby said newspaper agreed to publish said matter for the time and in the manner required by law, and for the consideration of sixty per cent, of the rates established by law for legal advertising. That relators had full knowledge at the time of said contract, of the terms and conditions thereof. That said Minster Post published said amendments in the manner required by law, and the amount due thereon had long since been approved by defendant, and the same has been paid by the treasurer of state on a warrant of the auditor of state, and that there are now no funds in the state treasury appropriated and set apart for the payment of relators’ alleged claim.
The authority for publishing said constitutional amendments is provided by the Legislature, Act of April 29, 1902 (95 0. L., p. 291).
Section 3 of that act provides that the state supervisor of public printing shall cause the amendments to the Constitution proposed to be published once each week in not less than one newspaper of general circulation in each county of the state wherein a newspaper is published, once each week for six months, and until the first Tuesday, after the first Monday of November, 1903, * # * and in counties having a German newspaper of general circulation, once a week in a German newspaper for said time; and in counties having two German newspapers of opposite politics, of general circulation in the county, it shall be published in each of such German newspapers.
Section 4 of the act prescribes that the charges shall not exceed sixty per cent, of the rates established in Section 4366, Revised Statutes, for legal advertising; that the costs of publication shall be paid out of the state treasury from any money *103 not otherwise appropriated, upon the warrant of the auditor of state, upon vouchers approved by the supervisor of public printing, who shall make legal measurements of the matter published.
The evidence shows that the newspaper of the relators and the Minster Post were both published in said Auglaize county, and were of the same politics. This being true, the defendant had legal authority to publish said amendments in but one German newspaper in said county. But said amendments were published in both of said papers. In the Minster Post under a contract in writing between the publishers thereof and defendant, which was the regular form of contract used by defendant for publishing said matter, stipulating the rate, etc. The publication in the Minster Post was approved and paid for out of the state treasury. The relators published the amendments under what they claim was a verbal contract with defendant, without any stipulation as to the rate or price thereof, the kind of type to be used, or any terms whatever.
The first question here is, Was the Minster Post a German newspaper of general circulation published in said county? If so, then that is as far as the inquiry here need go in a determination of this ease.
It would not matter if the defendant did subsequently make a verbal contract with relators to publish said matter, if he had already made a contract with another German paper of the same polities in said county for such publication. He could not make two such legal contracts with German papers in that county, and the second would be beyond his authority as such officer, and he could not obligate the state for the payment thereof. But relators claim that the Minster Post was not a German newspaper, and was not a paper of general circulation in that county.
Some time the latter part of April Conradi came to Columbus to see the defendant to solicit a contract to publish this matter. Defendant being absent, witness had an interview with defendant’s chief clerk. The latter informed Conradi that the order had been let to the Minster Post. Conradi claims that he then informed the chief clerk that the Minster Post was not a Ger *104 man newspaper. This the chief clerk denies, and says that Conradi made no such statement.
Some evidence was adduced tending to show that the Minster Post was a “German-English paper.” When it began this publication it was an eight-page paper, four pages in German and four in English. The local news and local advertisements were published in German on the outside pages. ÍThe inside pages were in English and constituted what was denominated “boiler-plate.” Shortly after the Minster Post began the publication of these amendments its form was changed, and published eight pages in German, and, in addition, had what was called a supplement of four pages made up of so-called “boilerplate.”
Defendant’s chief clerk testified that, prior to letting the contract to the Post, he made an investigation, and found from the directory that it was given as a German paper, and that the circulation of the two papers were about the same. Defendant testified that the Post was the only German paper recommended to him in that county, and that he heard of no other.
On the same day that Conradi claims the defendant made a verbal contract for relators’ paper to publish this matter, there was a meeting between this witness, the defendant and the attorney-general to investigate the claims made by the relator. Conradi admits that he then made no representation to the defendant and the attorney-general that the Post was not a German paper. The question of this paper’s circulation was the subject of investigation at this meeting.
There was much evidence pro and con concerning the alleged verbal contract claimed by relators. It appears that before relators applied to defendant for an order to make the publication of this matter that they had secured the plates from Cleveland preparatory to the publication.
Agler, the chief clerk, testifies that when he informed Conradi that the contract had already been let to the Minster Post, that Conradi informed him that they had the plates and would publish the amendments as news whether they got anything for it or not; that they could not afford to have another paper publish them and they not do so.
*105 Defendant denies that he authorized relators to publish the amendments. He says that he told Conradi that he would investigate into the Post, and would write him if he decided to give bim the contract; that as relators already had plates, if they cared to take the risk of making one publication, they could do so, and if the other people don’t show up that he would inform relators.
As I have heretofore stated, if defendant had already entered into a contract with the Minster Post, and if that paper was a German newspaper of the same politics as relator’s paper, published and of general circulation in said county, the evidence as to whether or not relators subsequently obtained a contract from defendant is not material to a determination of this case. In that event such a contract would not be binding as against the state.
Notwithstanding the Minster Post was published partly in English, I am inclined to the opinion that it was to all intents and purposes a German newspaper, and could reasonably come under that classification. None of its local news matter was published in English — all that was in German; and while there was no evidence as to the reason it published any matter in English, it can only be concluded that such was because it probably could not procure “boiler-plate” in German, and, as is customary with country weekly papers, it purchased stock, one half of which was already printed, leaving the other half to be mlade up and published by the proprietors of the newspaper. The latter, in fact, constitutes the paper as to its identification and classification, because it contains the news of local interest to its readers, and it also contains its politics and its policy. Besides during the period of the publication of these amendments the paper was made up of eight compact pages all in German. The four pages of English were a supplement separate from the other eight pages, and was also so-called “boiler-plate.”
I have examined all the authorities cited by counsel for relators, but I do not find them in point on the question here presented. In the multitude of contracts the defendant was called upon to make with newspapers throughout the entire state, and in each county of the state, for the publication of these *106 amendments under said act, he could not be held to the strict accountability as to the selection of newspapers that might otherwise apply under other circumstances, such as those cited by counsel. If he has exercised reasonable judgment in the selection of papers and has resorted to the best means within his power to seek • information, and has been actuated by honest motives, the state of Ohio could not be held liable from his acting on mistaken information no more serious in its consequences than that of selecting this paper as a German newspaper. In any event, in the performance of his duties, in order to hold the state liable, it would have ■ to appear that he exercised an absolute want of care and inadequate investigation.
Pangeman, Hempstead & Wheeler, for plaintiff.
Attorney-General, for defendant.
The evidence in this case does not warrant any such conclusion. On the other hand, it shows that the defendant exercised the best means within his reach in selecting this paper in the hasty acfion it was necessary for him to take in making these contracts.
My opinion is that the newspaper in question is in its classification a German newspaper, and, as such, the contract having first been made for the publication of this matter with said paper, no other contract binding against the state could be legally made with any other German newspaper in said county for the publication of the same matter.
For this reason I find that relators are not entitled to be paid compensation for the publication of said constitutional amendments by the state. The relief prayed for is therefore refused, and this cause is dismissed at the costs of the relators.